JOHN McCLANAHAN et al., Appellants, v.
SAMUEL McCLANAHAN et al.

Division One, June 2, 1914.

1. **LIMITATIONS: Permissive Possession: No Overt Acts of Adverse Claim.** Although the son lived upon the land, paid the taxes a part of the time, cleared it up, cultivated it, built an important addition to the house, used or sold the crops and appropriated the income, yet if the equitable title of the land

was in his father and his possession in its inception was permissive and was continued in friendly subordination to and in recognition of his father's right, in order for his possession to become adverse and to set the Statute of Limitations to running in his favor, there must have been an open and notorious claim of title, so made as to raise the presumption that his father knew thereof and acquiesced therein—there being no claim that the land was a gift to or purchased by the son. In such case the rule is the one applicable as between landlord and tenant, where the tenant claims by adverse possession.

2. **FRAUDULENT CONVEYANCE: To Defraud Creditors: Not Available to Adverse Claimant.** The fact that the purchaser of land placed the title in his son William to hinder and delay his creditors will not help another son Samuel in his claim of title by adverse possession. Besides, in this case, where the purchaser of land in 1872 is shown to have paid 28 out of 30 judgments obtained against him between 1856 and 1871, and the executions in the other two could not be found, there is not sufficient proof that he had it deeded to his son William for the purpose of defrauding his creditors, where William disclaims, after his father's death, the legal title.

3. **LIMITATIONS: Permissive Possession: Selling Part of Farm.** The fact that the son, who claims by adverse possession as against his deceased father, made a deed to forty acres of the farm, which the father had sold and for which he had received the money (the title having been placed in the son after purchase and payment by the father, in order that the father, being an officer, might take the acknowledgment), is a strong circumstance going to show that the son did not at that time claim the rest of the farm adversely to his father.

4. ————: ————: **Obtaining Patent to School Land.** The equitable title of the father, who had, by an unrecorded deed, bought from the heirs of Calhoun school land which Calhoun had paid for in his lifetime, was not affected by the fact that the son, after the father's death, obtained a patent from the county, by order of the county court, without paying anything therefor.

Appeal from Putnam Circuit Court—*Hon. George W. Wanamaker*, Judge.

REVERSED AND REMANDED.

*W. H. Childers, John W. Clapp* and *D. M.Wilson* for appellants.

(1) The trial court erred in its action dismissing plaintiffs' petition and in finding as a matter of fact that the defendant, Samuel W. McClanahan, was not a trustee holding in trust for the use and benefit of the heirs of H. T. McClanahan, deceased, the legal title to the west half of the southwest quarter of section 16, and entering its finding and decree that the legal title to said lands is in the said Samuel W. McClanahan, for the reasons: First (a.) This was school land ceded by the Federal government to the State for schools and educational purposes; (b.) Was duly advertised and sold to Elijah Casteel. (c.) Casteel's certificates of purchase were duly assigned to William Calhoun. (d.) Full payment of the purchase price was made by William Calhoun and the fact of payment ordered certified to the register of lands that patent might issue to him. (e.) These uncontroverted facts put the equitable title to all the lands described in the petition in sec. 16, in William Calhoun. R. S. 1845, chap. 159, p. 989, secs 7-8; R. S. 1909, secs. 7967, 7992. Second. (a.) The equitable title to the land in section 16 being now in William Calhoun, would at his death pass to his heirs, and, (b.) a patentee who secured a patent to this land with knowledge of the fact that the equitable title was in William Calhoun or his heirs, would not be permitted to retain the title. (c.) If Samuel W. McClanahan obtained the patent to this land with knowledge of the fact that the Calhoun heirs were the equitable owners, then he became a trustee for them or their grantee's use and benefit, and the trial court committed an error in failing to declare him such trustee. Barksdale v. Brooks, 70 Mo. 197; Carman v. Johnson, 20 Mo. 108; Boyd v. Springs Co., 137 Mo. 482; Valle v. Bryan, 19 Mo. 423. (d.) The records of the county court were constructive notice to Samuel W. McClanahan that the court had directed

the clerk to certify to the register of lands that the patent issue to Calhoun. (e.) The answer admits notice, for it is alleged that the land was bought by Casteel, that he sold it to Calhoun and that Samuel W. McClanahan bought out the Calhoun heirs and that they made him a deed. (f.) The stipulation shows that Samuel W. paid no money for the land when the county court in September, 1896, ordered it to be certified that a patent issue to him. (g.) Where a person purchases the legal title with the knowledge of an outstanding equitable title, he is but a trustee for the holder of the equitable title. McLaurin v. Morris, 30 Mo. 462; Smith v. Walser, 49 Mo. 250; Bailey v Winn, 101 Mo. 649. (h.) The procuring of the patent by Samuel W. McClanahan after the death of his father, and without the knowledge of the other heirs was fraud upon them. A patent thus obtained would convey no title to Samuel W. McClanahan, but would inure to the heirs of H. T. McClanahan, and would be held in trust by Samuel W. for the use and benefit of all the heirs. Carman v. Johnson, 29 Mo. 84; Jones v. Stanton, 11 Mo. 433; Picot v. Page, 26 Mo. 398; Dillinger v. Kellym, 84 Mo. 561; Campbell v. Light Co., 84 Mo. 352; Boyd v. Springs Co., 137 Mo. 482; Phillips v. Sherman, 36 Ala. 192; Larkein v. Gold Mine Co., 25 Fed. 337. (i.) Nor does the fact that the name of the grantee in the deed from the Calhoun heirs was left blank affect the case, for the controversy here is not between those heirs and the heirs of H. T. McClanahan, but between the heirs of the latter and Samuel W. McClanahan. (j.) The blank could have been filled in by the order of H. T. McClanahan. Fields v. Staggs, 52 Mo. 534; Bank v. Worthington, 145 Mo. 91; Burnsides v. Wayman, 49 Mo. 356; Campbell v. Smith, 27 Am. Rep. 5; Otis v. Browning, 59 Mo. App. 326; Thummel v. Holden, 149 Mo. 684; Einstein v. Land Co., 132 Mo. App. 84. (2) The trial court erred in not finding and entering its decree declaring

the defendant, William McClanahan, a trustee holding the legal title to the south half of the southeast quarter of section 17, in trust for the use and benefit of all the heirs of H. T. McClanahan, deceased, and in not ordering and directing that said land be partitioned and divided in kind. (a.) The letter of William McClanahan to his sister, Mrs. Helen Harvey, written after the institution of the suit admits the trust. (b.) Even where the conveyance is made in fraud, if the grantee admits the trust, the court will enforce it. Cottington v. Fletcher, Atkyn's, 156; Chaplin v. Chaplin, 3 Pere Williams, 233; Muckleston v. Brown, 6 Ves., Sr., 68. (c.) There is no claim set up in the answer that William McClanahan ever paid for the land, or that he ever sold it, gave it or deeded it to Samuel W. McClanahan, or to any other person. (d.) The answer further contains a disclaimer by William McClanahan of any interest in the land. 1 Perry on Trusts (2 Ed.), sec. 151, p. 168. (e.) There is no claim set up in the answer that Samuel W. McClanahan ever bought the land of William McClanahan or his father, or that either of them ever gave the land to him. (f.) H. T. McClanahan bought and paid for the land and had the deed made to William. Where land is so purchased and deeded William would hold the land in trust for his father, and upon his father's death for his heirs. 1 Perry on Trusts (2 Ed.), sec. 146, p. 163; Phillips v. Phillips, 50 Mo. 603; Olden v. Hendrick, 100 Mo. 533; Gibson v. Foote, 40 Miss. 788; Cook v. Bremand, 27 Tex. 457; Sutherland v. Sutherland, 19 Iowa, 325. (3) The trial court erred in its finding and decree that the defendant, Samuel W. McClanahan is the owner in fee of the south half of the southeast quarter of section 17. (a.) As Samuel W. McClanahan does not claim to hold the land as the grantee of either William McClanahan or his father, and as he does not claim it as a gift from either, the only title he could acquire would be by occupancy and adverse

possession. (b.) Samuel W. McClanahan does not have color of title to even a part of the land in section 17, and possession without color of title, though adverse, does not extend the holding beyond the limits of the actual possession. Pharis v. Jones, 122 Mo. 125; Wilson v. Purl, 148 Mo. 449. (c.) The evidence clearly shows that the possession of Samuel W. McClanahan was not adverse to his father, but permissive. (4) The trial court erred in its finding and decree that the defendant, Samuel W. McClanahan is the owner in fee of the northwest fourth of the northeast quarter and the northeast fourth of the northwest quarter of section 20. (a.) There is no evidence that Samuel W. McClanahan bought this land or contracted to buy it of Robert Campbell. (b.) The evidence is that his father bought the land of Robert Campbell, but never received a deed for it. (c.) The pleadings show that in his suit to quiet the title brought by Samuel W. McClanahan against the unknown heirs of Robert Campbell he relied on his adverse possession of the land alone. (d.) The evidence of the defendants taken as a whole does not show that the possession of Samuel W. McClanahan was adverse to that of his father, but was permissive; while all the evidence of plaintiffs shows that he was there simply as the manager of his father, who was the real owner of the land. (5) That the trial court erred in finding and rendering its decree in favor of the defendant, Samuel W. McClanahan, to any of the lands described in plaintiffs' petition, and this case must be reversed. Barkesdale v. Brooks, 70 Mo. 197; Carman v. Johnson, 20 Mo. 108; Boyd v. Springs Co., 137 Mo. 482; Valee v. Bryan, 19 Mo. 423; Truesdale v. Callaway, 6 Mo. 605. (6) To convert a friendly or subordinate possession into an adverse possession there must be a clear, positive and continued disclaimer and disavowal, and an assertion of an adverse right brought home to the owner. These are indispensable before any foundation can be laid

for the operation of the statute. Hamilton v. Boggess, 63 Mo. 249; Budd v. Collins, 69 Mo. 129; Meier v. Meier, 105 Mo. 431; Comstock v. Eastwood, 108 Mo. 41; Pitzman v. Boyce, 111 Mo. 387; Hunnewell v. Burchett, 152 Mo. 611; Hunnewell v. Adams, 153 Mo. 440; Baber v. Henderson, 156 Mo. 566; Stevenson v. Black, 168 Mo. 561; Coberly v. Coberly, 189 Mo. 17; Lumber & Mining Co. v. Jewell, 200 Mo. 707; Heckerscher v. Cooper, 203 Mo. 278; McCune v. Goodwillie, 204 Mo. 339.

*John W. Bingham, Campbell & Ellison* and *N. A. Franklin* for respondents.

(1) Samuel W. McClanahan has been in the actual, exclusive and continuous possession of this land since 1875, exercising the right of ownership and holding himself out to the public as the owner. His acts in fencing and improving the land, as well as building a new house and barn thereon, which must have been well known to plaintiffs, would alone show such adverse holding as to preclude plaintiffs from recovering in this action. He rented and leased the farm at his own pleasure without consulting with anybody; collected the rents and profits and accounted to no one for the same. What further could he do to bring the attention of the public to his ownership? This farm was always known from 1875 as the Sam McClanahan farm. Furthermore he has the tax receipts in his own name showing he paid the taxes from 1880. In fact, no one but Sam ever paid any taxes on this land. Myers v. Schuchmann, 182 Mo. 159; Patton v. Smith, 171 Mo. 231; Swope v. Ward, 185 Mo. 316; Glascock v. Car & Foundry Co., 229 Mo. 598. One witness testified he cut and hauled saw logs from almost every part of this farm, which were cut into lumber and sold by Samuel W. McClanahan. This constitutes an act of ownership. Holladay-Klotz Co. v. Markham, 96 Mo.

App. 51. After the death of H. T. McClanahan there was an administration of his estate and the administrator finally discharged, and likewise after the death of Mrs. H. T. McClanahan, there was an administrator of her estate appointed, who fully administered upon her estate and was discharged by the probate court. In neither of these administrations was this land belonging to Samuel W. McClanahan inventoried or any account taken of it whatever by the administrators. This was a recognition on the part of the heirs that Samuel W. McClanahan was the absolute owner of the land in question. (2) Samuel W. McClanahan gave a deed of trust on Calhoun land to Watson and again to Adams and finally sold the two north forties, making deeds therefor, which were put on record while John McClanahan was deputy recorder in the office at the time. The rule is that the sale of land and improvements thereon by one in possession, tends to show that his possession was under claim of ownership. Hunnewell v. Burchett, 152 Mo. 611; Hunnewell v. Adams, 155 Mo. 440. If H. T. McClanahan ever claimed any interest in this land, it would have been an easy matter for him to have observed many acts showing hostile claims on part of Samuel W. McClanahan. Robinson v. Claggett, 149 Mo. 153. (3) The Statute of Limitations applies to resulting trust, when knowledge of the adverse claim is brought home to the *cestui que trust* even if the court should so construe this case, but which the defendants deny. Reed v. Painter, 145 Mo. 341. (4) Resulting trusts may be established by parol testimony, but such evidence must be clear, cogent and fully satisfying the mind of the chancellor. Hillman v. Allen, 145 Mo. 638; Condit v. Maxwell, 142 Mo. 266; Curd v. Brown, 148 Mo. 82; Wacker v. Wacker, 147 Mo. 246; McMurray v. McMurray, 180 Mo. 246; Brinkman v. Sunken, 174 Mo. 709. Before any such a trust could have been created, there must have been some kind of a collateral agreement. In the

case of the deed to William, he knew nothing about it. Condit v. Maxwell, 142 Mo. 266. There must have been an intention to create some kind of a trust or one can not be enforced. Where is there any evidence that H. T. McClanahan ever had any title to the eighty acres in section 20, or the eighty acres in section 16, known as the Calhoun land? Neither is there any evidence that he ever paid a penny for it. In re Soulard, 141 Mo. 642. H. T. McClanahan never had the shadow of a title to either of the above tracts, nor did he ever claim to have. On the other hand every expression of his recognized Samuel W. McClanahan as the owner.

GRAVES, J.—The general outline of this case is so fairly and concisely stated by counsel for appellants, that we adopt their statement, as follows:

"This is a suit in equity. The parties are the heirs of the late Major H. T. McClanahan. The plaintiffs are the youngest son, John, the two daughters, Susan Crocker and Helen Harvey, and a granddaughter, Ada Dawson, the only child of a deceased son, Charles McClanahan. The defendants are the three sons, William, Samuel W. and Robert H. McClanahan. James E. Adams, the beneficiary, and Charles B. Linville, the trustee, in a deed of trust, were also made defendants, but as the deed of trust was paid off before the suit was tried, no further attention need be given them.

"Two hundred and seventy acres of land is involved in this litigation. It is all in township 63, range 20, Sullivan county, Missouri, and from five to six miles northwest of Milan. Almost every forty of it is touched by or lies along side Main Locust creek or Big creek, as it is commonly called, the largest stream of water in the county.

"The land is all in one body. One hundred and ten acres are in section 17, eighty acres in section 16,

and eighty acres in section 20.    Sections 16 and 17 are in Jackson township, and section twenty in Polk township.

"The legal title to eighty acres of the land in 17 is in the defendant William McClanahan, and the legal title to the remaining thirty acres is in the plaintiff John McClanahan.    It is alleged in the petition that at the time of his death the equitable title to all of this hundred and ten acres was in their father, Major H. T. McClanahan, and the court was asked to declare each of them trustees, holding their respective tracts for all the heirs.

"The legal title to the land in 16, which at the time of the Major's death was one hundred and twenty acres, was in the defendant, Samuel W. McClanahan, but it is alleged that the equitable title to all of it was in the Major at the time of his death, and that after his death, Samuel W. McClanahan had fraudulently procured a patent for the land to be issued to him, and had sold forty acres of it to one James H. White.    The court was asked to declare Samuel W. a trustee holding the eighty acres in trust for all the heirs.    In another count in the petition the court was asked to charge the purchase price of the forty sold, five hundred dollars, against Samuel W.'s share.

"The legal title to the land in section 20, was in the heirs of Robert Campbell, but the equitable title, it is alleged, was in the Major at the time of his death. Previous to the bringing of this suit, the defendant Samuel W. McClanahan had brought suit against the unknown heirs of Robert Campbell, to have the title to this land quieted.    A count in the petition asked that Samuel W. be enjoined from litigating that suit until this one had been determined.

"As stated above, there was also a count for the partition of the two hundred and seventy acres.

"The case was taken by change of venue to Adair county, and from there to Putnam county, where it was

tried at the November term, 1907. After trial it was taken and held under advisement by the court until the 4th day of May, 1909, when a decree was entered dismissing plaintiff's bill, and adjudging Samuel W. McClanahan to be the owner in fee of the whole 270 acres.

"From that judgment, which the plaintiffs think is at variance with the facts in the case, as well as the law, an appeal has been taken to this court."

It will be observed that the case naturally divides itself into four sub-divisions i. e. (1) the status of the land in section 17 (80 acres), the legal title of which stood in William McClanahan at the institution of this suit; (2) the status of the land in section 17 (30 acres), which stood in the name of John McClanahan at the institution of the suit; (3) the status of the land in section 16 (120 acres), the legal title of which stood in Samuel W. McClanahan and James H. White at the institution of the suit, and (4) the status of the land in section 20 (80 acres), the legal title of which stood in the heirs of Robert Campbell at the institution of the suit. Different legal principles and varying facts are urged as to each of these four tracts or parcels of land, and a clearer understanding can be reached by treating them separately, and recounting the applicable facts in connection with the legal proposition urged. Such will be the course of the opinion, and a fuller statement of facts and contentions will therefore be left to the opinion.

I. Major H. T. McClanahan, the father and grandfather of the parties to this suit, for some years prior to 1872 lived in Linneus, in Linn county, Missouri. He left that place and moved to the land involved in this suit in 1872. We shall take the land involved in section 17 first. It stands practically conceded, both by proof and pleading, that Major

Limitations: Possession Permissive in Its Inception.

McClanahan bought from Robert Campbell 120 acres of land in section 17 some time before he moved from Linn county to Sullivan county. Eighty acres of this 120 is involved here. On this eighty stood a little log house, which the Major moved about a quarter of a mile to the west. It is not denied that the Major paid for this land, but the deed was made to his son William McClanahan, who at the time was in business in Linneus, but lived at his father's house. William McClanahan does not claim to be the owner of this land, although the legal title stands in his name. He wrote a letter to his sister, one of the plaintiffs, in which he frankly says that the land belonged to his father, and that he held it in trust for the father. This letter is in evidence.

The answering defendants aver that the title to the eighty acres in section 17, is in Samuel W. McClanahan, by virtue of his adverse possession for the statutory period of thirty-one years or more, i. e., since 1872. They also aver that plaintiffs cannot claim title, because Major McClanahan had the land deeded to William McClanahan to defraud his creditors. To my mind the proof fails to show a conveyance to defraud creditors. It is true that there were, running from 1856 to 1871, numbers of judgments rendered against H. T. McClanahan, but when the executions were looked up it was found that in one way or another they had all been satisfied, except in two instances. There were thirty of these judgments, and clear evidence of the satisfaction of twenty-eight of them long before this land deal in 1872. The satisfaction of most of them had to be shown by looking up the old executions and finding thereon the return of satisfaction. In the two remaining judgments no executions could be found; they were not with the papers. We would not feel like holding that this land was deeded to William McClanahan to defraud creditors on this limited showing. The trial court not only found that this eighty acres in section 17 belonged to Samuel W. McClanahan, but

also that the thirty acres, the title to which stood in the name of the plaintiff John, likewise belonged to him. This calls for the evidence going to show adverse possession. Speaking now as to this eighty acres, it is clear that Major McClanahan moved on it with his wife and two of his boys (Samuel W. and John) in the early part of the year 1872. Samuel W. was born in 1854 and hence was then about eighteen years of age. John was some years younger. That the Major lived there until January 1, 1875, when he moved to Milan to take possession of the office of circuit clerk and recorder, there can be no question. Under the admission of William McClanahan, found in this record, that the equitable title to this land was in Major McClanahan during these three years there can be no question. When he left the farm in January, 1875, he left there his wife and two boys. No change in title to this time. Shortly his wife followed him to Milan, but when she did, then the Major got a married daughter and her husband to come and live on the place with the two boys. Still the title, such as it was, remained in the Major. In two or there years the son John was taken from the farm to Milan, and became the father's deputy in the office. This left the defendant Samuel W. and the married daughter. No change in title as yet. In 1880 the son Samuel W. married, and shortly thereafter the daughter removed to their own farm. No change in title, therefore, from 1872 to 1880 or 1881. During all these years the farm was being cleared and improved. Both boys and the son-in-law helped do the work. We have, then, from 1880 to 1896 (the latter being the year in which the Major died) in which to look for a change of title. The land was being cleared and put into cultivation under the direction of Samuel W. and he himself doing some of the work. Several years of this interim Samuel W. himself was in Milan in business and not on the farm, but he returned and was there at the father's death. Either

just before or just after the father's death he added to the house at an expense estimated at about $1000, but the evidence shows that he had the use of the farm. Part of the time the taxes were paid by him and for a part by the Major. Many of the neighbors were put upon the stand, but they did not know whether the Major claimed the farm, or Samuel W. claimed it. All they could testify was that Samuel W. was there running it. There is evidence as to forty acres of another portion of the land being sold to one Henry, and that Samuel W. made the deed, but the money was paid to the Major. The remainder of that tract is being claimed by Samuel W. just as is this tract, and we mention this as a strong circumstance. This sale was made in 1885, or five years after Samuel W. married, and was living on the farm. There can be no question that Major McClanahan sold this forty acres and got the money for it, although he had put the title in Samuel W. and had Samuel W. make the deed. This matter we will discuss more fully when we reach the land in section 16, because this forty acres was a part of a tract which the Major claimed in section 16, a part of which is being claimed by Samuel W., just as he claims the eighty acres and the thirty acres in section 17. It is quite clear that Samuel W. was making no claim to any of this land in 1885. Nor does the evidence of his neighbors show his claim of title later. Upon this phase of the case, the proof only goes to the extent of his living upon the place, paying taxes part of the time, cleaning it up and putting it into cultivation, and the building of the additions to the home about the time of the father's death. That Samuel W. was in possession from the time the married sister and her husband left up to the making of this deed in 1885, without claiming title, is quite clear. He was there and it must have been by and with some arrangement with the father—a permissive possession. There is no claim in the answer that he ever bought this land of the

father, nor does the answer aver that the father gave it to him. That the father once owned the equitable title to the land there can be no doubt. That the possession of Samuel W. was not at first adverse there can be no doubt. The question then is, when did it become adverse to the father, and what is the evidence of such fact? We have examined this record in detail, and when it stands conceded, as it must, that the defendant Samuel W. held the possession of this land for his father in the beginning and for some years, then there is no evidence of such overt acts and notorious claim of title as would defeat the rights of Major McClanahan. One witness testifies (his reputation is impeached, it is true) that Samuel said to him that his father was letting him have the farm for the improvements (clearing and reducing to cultivation) and the payment of taxes. Whether that was the arrangement or not it is clear that there must have been some arrangement, because the record shows that his first possession was under the father. His first work on the place was under the father. No act was done by him which could not be naturally referable to some amicable arrangement between the father and son about the possession of this farm, and that, too, without a surrender of the father's title. The most that his neighbors know is that Samuel W. was in possession, making improvements and using the products of the farm. The strongest circumstance is the building of the addition to the house at a cost of about $1000, and this could be readily referred to some arrangement other than the transfer of the property. It is true that the daughter of Samuel W. who lived awhile with Major McClanahan, says that the Major spoke of the place as Sam's place, but the defendant Samuel does not in his answer aver either a gift or a purchase, and it certainly required one of the two to make it Samuel's place, unless Samuel W. acquired title by open and notorious claim

of title, so made as to raise the presumption that the father knew thereof, and acquiesced therein. The evidence fails to show the latter condition. It being clear that the holding and possession of Samuel W. was under the father, the doctrine of adverse possession as applicable between landlord and tenant, is the doctrine applicable here. And the quantum of proof required in such case is the quantum required in this case. In 1 Cyc. 1058 the general rule and the reason therefor is thus announced:

"*Statement of Rule.* The general rule is well settled that a tenant cannot dispute the title of his landlord by setting up title either in himself or in a third person during the existence of the lease or tenancy. While the decisions are far from harmonious as to what acts will initiate an adverse possession by the tenant, it is at least well settled that there can be no adverse possession by the tenant until one of the following acts has occurred; surrender of the premises to the landlord, actual, open, and notorious disclaimer of the landlord's title brought to his knowledge, or actual disseizin or ouster of the landlord. The disclaimer and notice thereof must be actual, or so open and notorious as to raise the presumption of notice, and the statute will run only from the time of such knowledge or notice.

"*Reason for Rule.* The principle of estoppel applies to the relation between landlord and tenant and operates with full force to prevent the tenant from violating that contract by which he claimed and held possession. He cannot change the tenure by his own act merely, so as to enable himself to hold against the landlord, who reposes under the security of the tenancy believing the possession of the tenant to be his own, held under his title, and ready to be surrendered by its termination by lapse of time or time of possession."

This rule applies whether the landlord's title be legal or equitable, perfect or imperfect. [1 Cyc. 1060.]

The general rule has some modifications which are well put in 1 Cyc. 1060, thus:

"In a preceding section it has been shown that, as a general rule, the possession of the tenant is the possession of the landlord, and that in the absence of certain acts or declarations on the part of the tenant there can be no adverse holding by him. In this section an attempt will be made to show under what circumstances the possession becomes adverse. There are a number of decisions which hold, or seem to hold, without any qualification, that where a person enters into possession by virtue of a lease he cannot initiate an adverse possession without first surrendering the premises to the landlord. It is believed, however, that the weight of authority is against this position. According to a considerable number of decisions, when the tenant disclaims to hold under the lease, and the landlord has notice of it, the tenant's possession is adverse, and the statute will run from the time when the landlord has notice; and this notice, it seems, need not be actual or express. It will probably be sufficient if the disclaimer of the tenant is so open and notorious as to raise the presumption of notice. Surrender of the premises is not necessary when the landlord has notice of disclaimer."

This doctrine is not confined to strict cases of landlord and tenant, but it goes to a school of cases where the possession in the first instance was a friendly possession. [Coberly v. Coberly, 189 Mo. l. c. 17.]

In the Coberly case this court said: "Another legal principle must be applied to the facts of this record in solving the question of adverse possession, viz., a possession which was in its inception friendly, as under a lease, or for some definite term, or subordinate to the true title, or originating in a fiduciary relation, may not be turned into an adverse possession by a mere change in mental attitude or by caprice. [Comstock v. Eastwood, 108 Mo. 41; Handlan v. McManus,

100 Mo. 124; Budd v. Collins, 69 Mo. 129; Lawson v. Cunningham, 21 Ga. 454; Ord v. De La Guerra, 18 Cal. 67.] The principle that a tenant may not deny his landlord's title is, also, somewhat applicable."

In the kindred case of cotenants, Allen v. Morris, 244 Mo. l. c. 364, we said: "Whilst the acts (whether verbal or otherwise) to show an adverse claim must be acts clearly repudiating and denying the rights of the cotenant, and must be such as will show a clear intention to hold adversely as to the other cotenants, yet 'it is not essential, however, that it be shown that such acts were brought to the notice of the cotenant.' [Hendricks v. Musgrove, 183 Mo. l. c. 309, and cases cited therein.] If such acts are such as to demonstrate to the immediate and surrounding neighbors an adverse claim, the cotenant must take notice thereof. In other words, his knowledge must be the general knowledge of the neighborhood wherein the land is situated."

But the evidence of adverse possession, prior to the death of Major McClanahan, in this case does not measure up to this rule. The neighbors heard no substantial claim of title from Samuel W. McClanahan. When pressed they said that they did not know who put the tenants on the place when there were tenants there, nor did they know who claimed the title. So we say, conceding as we must concede from this record, that the possession of Samuel W. McClanahan was at first friendly, there is no such strong proof of adverse claims, as would give him title by adverse possession to this eighty acres of land in section 17. We may further add that, although there might have been evidence tending to show that the title of this eighty acres was placed in William McClanahan to hinder and delay creditors, yet with William McClanahan conceding that he held it in trust for his father, this defendant is in no position to claim any rights by reason of the alleged fact. The decree *nisi* was wrong in so far as this eighty acre tract is concerned.

II.   What has been said as to the eighty-acre tract in section 17, applies with equal force as to the thirty-acre tract.   The legal title to this thirty acres was in the plaintiff John McClanahan, but he concedes in his petition that he held it in trust for the father, and claims no further interest therein than as one of the heirs of his father. What we have said upon the Statute of Limitations as to the eighty acres applies with equal force here.   The decree *nisi* was wrong in giving Samuel W. McClanahan the title to this tract.

**Permissive Possession.**

III.   We reach now the land in section 16.   This was originally school land.   That Major McClanahan was claiming this land when he was living upon the farm prior to January 1, 1875, there is no question.   The records of the county court show a sale of this land to Elijah Casteel in 1857, his assignment to William Calhoun, the payment of the purchase money by William Calhoun, and an order to the clerk to certify the same to the register of lands for a patent to William Calhoun.   Calhoun was killed during the war, and what, if any, arrangements there were between him and Major McClanahan does not appear. It does appear that when the Major moved to the farm from Linneus in 1872, he laid claim to this 160 acres of land.   It does appear that he made out a deed for the heirs of William Calhoun to sign, and one of the heirs testifies that Major McClanahan brought the deed to his house, and said he was paying the heirs $15 each for their release, and did pay him $15 and he and his wife signed it.   John McClanahan testifies that after he became his father's deputy he saw the deed in a desk in his father's office, signed by all the Calhoun heirs and acknowledged before his father.   That the name of the grantee was left blank.   That in 1885, when the Major sold forty acres to R. L. Henry, at the

**Making Deed Without Consideration.**

suggestion of John, the Major having taken the acknowledgment to the deed, the name of Samuel W. McClanahan was put in as grantee, and Samuel W. made Henry the deed to the forty acres. Henry says he bought from Major McClanahan and paid Major McClanahan, and that the Major told him to tell Sam to come in and make the deed, which was done. It is clear to my mind that this is the reasonable and should be the accredited version of this transaction. It is clear, as indicated in our first paragraph, that Samuel W. was not asserting title at this time.

November 27, 1896, after the death of the father in April of the same year, Samuel W. McClanahan procured in his name the patent to this land which had been ordered by the county court to Calhoun. He made no payment of the purchase price, for that had been paid. This act, being after the death of Major McClanahan, could not affect his equitable title, if he had such, and we think he did. What we have said above as to the Statute of Limitations, applies with equal force here. Vhen Major McClanahan died in 1896, he was, under the record, the equitable owner of the land in section 16, involved in this suit. The evidence is not sufficient to show adverse possession against him, nor against his heirs as cotenants, as the rule of law goes in this State and elsewhere. The decree *nisi* was wrong as to this land.

IV. Going now to the land in section 20. This land the Major bought from Robert Campbell, but received no deed. Whether the whole of the purchase money was paid is a question—we rather think not. But it is clear that Major McClanahan had the possession of this land, with the other lands herein discussed, in 1874. It is also clear that the defendant Samuel W. McClanahan became possessed of this tract just as he did the others hereinabove discussed. He does not claim to have acquired Major McClanahan's

right either by gift or purchase. When he brings suit under old section 650 to quiet title, as he did, he bases that action upon adverse possession solely, and not upon gift or purchase. The facts as to adverse possession we have fully covered above. They were not sufficient to show such claim during the life of Major McClanahan, nor as against his heirs since.

Upon the whole, the judgment upon the present record is wrong and should be reversed.

Let the judgment be reversed and the cause remanded to be further proceeded with in accordance with the views herein expressed. All concur.